## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| STROUDWATER ASSOCIATES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Docket No. 2:21-cv-00086-NT |
| | ) |
| ROBERT KIRSCH, et al., | ) |
| | ) |
| Defendants. | ) |

## ORDER ON COUNTER-CLAIMANTS' MOTION TO AMEND AND COUNTER-DEFENDANTS' MOTION TO DISMISS

Before me are two related motions: a motion by the Counter-Claimants to amend their counterclaims ("**Counter-Claimants' Mot. to Amend**"), and a motion by the Counter-Defendants to dismiss the counterclaims. For the reasons stated below, the motion to amend is **GRANTED**, and the motion to dismiss is **DENIED**.

## BACKGROUND[1]

### I.    The Agreements

Around April 2018, Plaintiff/Counter-Defendant Stroudwater Associates ("**Stroudwater**") entered into a series of Purchase Money Loan Agreements ("**Loan Agreements**") with five Stroudwater employees,[2] Defendants/Counter-Claimants John Behn, Laurie Daigle, Douglas Johnson, Robert Kirsch, and C. Ryan Sprinkle

---

[1]    The facts below are drawn from the allegations in the Counterclaims and the Amended Counterclaims, which I take as true for the purposes of deciding a motion to dismiss. *Alston v. Spiegel*, 988 F.3d 564, 571 (1st Cir. 2021).

[2]    Stroudwater Associates entered into Purchase Money Loan Agreements with other employees, too, but those employees' agreements are not germane to the disposition of these motions.

(the "**Noteholders**"). Countercls. ¶¶ 11, 13, 18 (ECF Nos. 12, 13, 14, 15, 16); Loan Agreements (ECF Nos. 12-2, 13-2, 14-2, 15-2, 16-2).[3] In exchange for an agreement to pay each of the Noteholders a particular sum of money—which was secured by a Purchase Money Note (the "**Note**")—the Noteholders agreed to lend Stroudwater money to buy up the Noteholders' stock (the "**deal**") in order to create an Employee Stock Ownership Plan ("**ESOP**"). Countercls. ¶¶ 11, 13–14. These Notes were entered into simultaneously with the Loan Agreements. Loan Agreements § 3(c). And the Loan Agreements say that the Notes and Loan Agreements "have been made under substantially similar terms as" described in the Loan Agreements unless the Notes say otherwise. Loan Agreements § 3(c).

Stroudwater agreed to pay interest on the Notes, and the Loan Agreements specify that "[p]ayments of interest shall be made bi-annually" on the first of January and on the first of July each year for a period of twenty years. Loan Agreements §§ 1, 2(a), (f). The Loan Agreements state that Stroudwater will be in default if it "fail[s] to make any payment of the principal of the . . . Note within twenty (20) days after" it becomes due. Loan Agreements § 6. But there exists no such provision for the failure to pay interest. Rather, if Stroudwater fails to pay any interest due on the Note within twenty days of its due date, that "unpaid interest shall be added to" the

---

[3]      Because the Counter-Claimants' counterclaims and the attached exhibits are identical in most respects, for the sake of convenience, I refer to the counterclaims and exhibits collectively unless it is necessary to specify a particular Counter-Claimant's counterclaim or attached exhibit. These counterclaim references only refer to the originally filed Counterclaims, not the Amended Counterclaims that two of the Counter-Claimants now seek to file.

unpaid principal, causing the principal amount due under the Note to be adjusted. Loan Agreements § 6.

Three other provisions of the Loan Agreements are relevant here. One is a requirement that Stroudwater permit the Noteholders to access and copy Stroudwater's books and records upon the Noteholders' requests. Loan Agreements § 5(g). The second is that Stroudwater "shall pay all Collection Costs promptly upon the [Noteholders'] demand from time to time." Loan Agreements § 5(f). The Loan Agreements define "Collection Costs" as:

> any and all costs and expenses of enforcing [the Loan Agreement] including, without limitation, any and all costs and expenses of collecting [on] the [Note] and exercising the [Noteholder's] rights and remedies . . . and any and all other expenses incurred by the [Noteholder] after the occurrence of any Default . . . . In all such events, such costs and expenses shall include, without limitation, the reasonable fees, expenses and disbursements of the [Noteholder's] legal counsel.

Loan Agreements § 1.

And the third relevant provision of the Loan Agreements is that the Note and any accrued interest are secured by the assets of Stroudwater but are always subordinate to any security interest "by a bank lender or other creditor of" Stroudwater. Loan Agreements § 2(h). This provision is consistent with the Junior Security Agreements ("**JSAs**") that the Noteholders entered into with Stroudwater a few months before the Loan Agreements. JSAs (ECF Nos. 12-3, 13-3, 14-3, 15-3, 16-3). The JSAs state that the Noteholders' security interests are "subject and subordinate to [a] Senior Security Agreement" and obligate the Noteholders "to confirm such subordination in writing at the request of [a] holder of [a] Senior

Security Interest." JSAs § 2. In the JSAs, Stroudwater agreed to perform its obligations "in any agreement creating a Senior Security Interest or a Pari Passu Security Interest." JSAs § 4(f). The JSAs define a "Pari Passu Security Interest" as "the security interest granted by" Stroudwater to the Noteholders. JSAs § 1. The JSAs also prohibit Stroudwater from merging with another entity, at least under certain circumstances. JSAs § 6.

In conjunction with the JSAs, the Noteholders also entered into Intercreditor Agreements. Intercreditor Agreements (ECF Nos. 12-4, 13-4, 14-4, 15-4, 16-4). In signing the Intercreditor Agreements, the Noteholders agreed that their security interests were "of equal priority." Intercreditor Agreements § 2 (emphasis deleted). As a result, in the event of distribution of Stroudwater's assets, the Noteholders agreed that these assets would be distributed "in proportion to [the] amounts owing to the [Noteholders] on account of their outstanding Loans to" Stroudwater. Intercreditor Agreements § 3(a) (emphasis deleted).

One final group of documents is relevant to the motions before me. That consists of the Subordination Agreements entered into by the Noteholders around the same time as the Loan Agreements. Subordination Agreements 1 (ECF No. 23-1). The parties to the Subordination Agreements are Stroudwater, Bangor Savings Bank ("**BSB**"), and the Noteholders. Subordination Agreements 1. According to the Subordination Agreements, the Noteholders (the "Junior Creditors") agreed: (1) to subordinate "all rights, claims and interests created pursuant to the Loan Documents" to money owed to BSB (the "Senior Creditor"); (2) that their claims "at

all times remain[ed] fully unsecured"; (3) that they have a "right to receive regularly scheduled payments of accrued interest (but not principal or any other amounts) on the remaining unpaid balance of the" Note; and (4) that the Noteholders would not "make demand for all or any portion of" the money owed to them or "commence any action or proceeding against [Stroudwater] to recover all or any part of the" money owed to them, until Stroudwater paid the money it owed to BSB. Subordination Agreements §§ 1(c), 4, 5, 8.

## II.    Stroudwater's Alleged Breaches

The Noteholders allege that beginning in late 2018, Stroudwater began to struggle financially. Countercls. ¶¶ 32–36. And they allege that Stroudwater's debts exceed its assets. Countercls. ¶¶ 47, 51. Among other debts, Stroudwater has a multi-million dollar outstanding loan to BSB and owes more than two million dollars to the Noteholders. Countercls. ¶ 49.

As Stroudwater began to founder, Counter-Defendant Jeffrey Sommer, the managing director of Stroudwater and a member of the Stroudwater Board of Directors ("**BOD**"), continued to receive a lucrative compensation package. Countercls. ¶¶ 3, 61. The Noteholders assume that this continues to be the case, and they allege that this is improper. Countercls. ¶ 62. The Noteholders allege that the members of the BOD, including Counter-Defendants Eric Shell and Opal Greenway, have a duty to review Mr. Sommer's performance and compensation package and to make any necessary adjustments to it. Countercls. ¶¶ 4–5, 62.

In 2019, Mr. Sommer took a personal bonus based on anticipated revenue from a project, but the client then became insolvent, and Stroudwater was left with an

5

unsecured claim exceeding $300,000. Countercls. ¶ 63. After Stroudwater was advised that it should expect no recovery on this claim, Mr. Sommer and Mr. Shell refused to remove this uncollectible receivable from Stroudwater's books in an effort "to prop up" its financial statements and overstate Stroudwater's value. Countercls. ¶ 64. They did so in order to protect their incentive compensation. Countercls. ¶ 64.

The Noteholders contend that, as a result of its financial difficulties, Stroudwater began to shirk its obligations under the Loan Agreements and the other contracts outlined above. For example, Stroudwater did not make all of the interest payments that were due under the Loan Agreements on January 1, 2020, (the "**January Payments**") including the payment owed to Mr. Kirsch. Countercls. ¶ 37. However, Ms. Greenway received her January Payment. Countercls. ¶ 37. Some individuals who did not receive their January Payments but remained employed by Stroudwater or sat on its BOD were reimbursed in some form, but others, like Mr. Kirsch, have not been. Countercls. ¶¶ 38–39. Stroudwater also failed to make any of the next two interest payments due to the Noteholders under the Loan Agreements. Countercls. ¶ 42.

The Noteholders further allege that Stroudwater overstated and misrepresented its financial performance in 2020, which benefitted Mr. Sommer, Mr. Shell, and Ms. Greenway (the "**Individual Counter-Defendants**"). Countercls. ¶¶ 40–41. And Stroudwater refused to allow the Noteholders to review its books and records to verify this allegation despite a demand by the Noteholders. Countercls. ¶¶ 43, 56, 58.

The Noteholders allege a number of other improprieties by the Individual Counter-Defendants, including that: (1) as the sole ESOP trustees (and thus the sole shareholders of Stroudwater), they have used their positions to perpetually appoint themselves to the BOD; (2) they have acted in their own interests rather than those to whom they owe a fiduciary duty, such as by taking steps to remove high-performing employees to ensure that they and their favored employees get the highest bonuses; and (3) they have authorized and approved bonuses and raises in ways that benefit themselves and their supporters. Countercls. ¶¶ 15, 66, 68–70.

The Noteholders also allege that Stroudwater violated the JSAs when, in November 2020, it merged with another entity. Countercls. ¶ 44.

### III.   Behn and Daigle Allegations of Discrimination

Ms. Daigle began working for Stroudwater in 2010. Daigle Proposed Am. Countercl. ("**Daigle PAC**") ¶ 72 (ECF No. 27-5). In 2013, she was diagnosed with a chronic illness. Daigle PAC ¶ 74. Stroudwater then determined that Ms. Daigle's illness made it too risky for her to travel, which was an essential function of her job. Daigle PAC ¶ 79. After Ms. Daigle underwent successful treatment and was cleared to return to work by her doctor, Stroudwater decided to restructure Ms. Daigle's job to eliminate travel from her job duties. Daigle PAC ¶¶ 80–81. This impacted Ms. Daigle's ability to perform her job, of which travel was a significant part. Daigle PAC ¶ 87. Due to this, Ms. Daigle decided to resign her position in April 2013. Daigle PAC ¶ 98.

In 2014, Mr. Behn became the President of a new Stroudwater subsidiary. Daigle PAC ¶ 100. And in November 2014, Stroudwater re-hired Ms. Daigle to work

for this new subsidiary. Daigle PAC ¶ 99. In these positions, Mr. Behn and Ms. Daigle performed audits of the functionality of a pricing tool that Stroudwater had developed for some of its clients. Behn Proposed Am. Countercl. ("**Behn PAC**") ¶¶ 74, 79 (ECF No. 27-4); Daigle PAC ¶ 105. While in this new position, Ms. Daigle's performance and employment continued to be evaluated through the lens of Stroudwater's unfounded concerns about her health. Daigle PAC ¶¶ 118–19.

Beginning in 2016, Mr. Behn and Ms. Daigle repeatedly notified Stroudwater management that their audits had revealed problems that would create issues for Stroudwater's clients and for Stroudwater's ability to maintain compliance with the state and federal grants and funds used to build the pricing tool. Behn PAC ¶¶ 80– 82, 84–85, 96–97; Daigle PAC ¶¶ 111–16. This compounded Stroudwater's already-disparate treatment of Ms. Daigle. Daigle PAC ¶ 130. Mr. Behn did not receive a response to at least some of the concerns that he raised. Behn PAC ¶¶ 83, 86.

Beginning in 2016, Mr. Behn's stock award and pay raises began to decrease over prior years despite his increasing performance. Behn PAC ¶ 98. When Stroudwater transitioned to the ESOP, he was not given shares of the ESOP that matched his level of contributions to the company, and his Note was undervalued by at least $800,000. Behn PAC ¶¶ 99–102. Employees who were less tenured and lower producers received more shares than Mr. Behn did. Behn PAC ¶ 103. In the case of Ms. Daigle, she received lower raises, less recognition, and fewer shares and stock options than other Stroudwater employees who were not performing as highly as she was. Daigle PAC ¶ 117.

On May 19, 2020, Mr. Behn and Ms. Daigle notified Stroudwater that they were resigning, and all parties agreed that June 30, 2020, would be their final day of employment at Stroudwater. Behn PAC ¶ 109; Daigle PAC ¶ 131. In this interim period, Mr. Behn and Ms. Daigle both had discussions with Stroudwater about an ongoing contract employment relationship to help transition Stroudwater clients after their departures. Behn PAC ¶ 110; Daigle PAC ¶ 140.

On June 26, 2020, Mr. Behn and Ms. Daigle were notified that their employment was terminated for cause, effective June 29, 2020, because they had sent a proposal to a current Stroudwater client for the purpose of providing services without Stroudwater's consent and in an effort to compete with Stroudwater for such services, in violation of their employment agreements. Behn PAC ¶ 112; Daigle PAC ¶¶ 132–33. While Mr. Behn and Ms. Daigle did submit two such proposals, they were submitted on behalf of Stroudwater pursuant to the transition discussions in which Mr. Behn, Ms. Daigle, and Stroudwater had previously engaged. Behn PAC ¶¶ 117–19; Daigle PAC ¶¶ 135–138.

At the time of Mr. Behn's and Ms. Daigle's separations from Stroudwater, they were each entitled to certain compensation for calendar years 2019 and 2020 that Stroudwater had not paid them. Behn PAC ¶¶ 122–25, 128; Daigle PAC ¶¶ 146–49, 152.

## IV.   The Counterclaims

In March 2021, Stroudwater sued the Noteholders, for alleged breaches of their employment agreements, Compl. (ECF No. 1), the particulars of which are not relevant here. In conjunction with their Answers, the Noteholders brought various

9

counterclaims against Stroudwater, Mr. Sommer, Mr. Shell, and Ms. Greenway (the "**Counter-Defendants**"). Counterclaim Count I—asserted by each of the Noteholders—alleges that the Counter-Defendants have breached § 5(g) of the Loan Agreements by denying the Noteholders access to Stroudwater's books and records. Johnson Countercl. ¶¶ 71–77; Kirsch Countercl. ¶¶ 71–77; Sprinkle Countercl. ¶¶ 71–77; Behn Countercl. ¶¶ 87–93; Daigle Countercl. ¶¶ 86–92. To remedy this alleged breach, the Noteholders are seeking a decree of specific performance requiring Stroudwater to provide the requested books and records and an award of attorneys' fees. Johnson Countercl. ¶¶ 78–79; Kirsch Countercl. ¶¶ 78–79; Sprinkle Countercl. ¶¶ 78–79; Behn Countercl. ¶¶ 94–95; Daigle Countercl. ¶¶ 93–94.

Counterclaim Count II—also asserted by each of the Noteholders—alleges that the Counter-Defendants have breached their fiduciary duties, in particular their duty to Stroudwater's creditors (which include the Noteholders). Johnson Countercl. ¶¶ 80–101; Kirsch Countercl. ¶¶ 80–101; Sprinkle Countercl. ¶¶ 80–101; Behn Countercl. ¶¶ 96–117; Daigle Countercl. ¶¶ 95–116. Specifically, the Noteholders allege that the Counter-Defendants have breached their fiduciary duties in the following ways: (1) the BOD disparately treated Stroudwater creditors in violation of the various contracts signed as a part of the deal; (2) the BOD engaged in self-dealing by making interest payments to Ms. Greenway but not to all of other creditors who were owed interest payments (including Mr. Kirsch); (3) the BOD approved a merger in violation of the JSAs, and at a time when Stroudwater was unable to pay its debts; (4) the Counter-Defendants failed to allow the Noteholders access to Stroudwater's

books and records; (5) the Complaint is frivolous and was only filed by Stroudwater to try to gain leverage over the Noteholders; (6) Mr. Sommer and Mr. Shell overstated and misrepresented the financial position and value of Stroudwater, and received inflated compensation as a result, to the detriment of the ESOP participants and Stroudwater's creditors; and (7) the Individual Counter-Defendants have forced out some Stroudwater employees (and favored others) in order to elevate their own standing at the expense of the ESOP participants and Stroudwater's creditors. Johnson Countercl. ¶¶ 88–100; Kirsch Countercl. ¶¶ 88–100; Sprinkle Countercl. ¶¶ 88–100; Behn Countercl. ¶¶ 104–16; Daigle Countercl. ¶¶ 103–15.

Mr. Kirsch's counterclaim has another breach of contract claim ("**Kirsch Count III**") that he brings against all of the Counter-Defendants. Kirsch Countercl. ¶¶ 102–08. Specifically, Mr. Kirsch alleges that Stroudwater's failure to make his January Payment, while making the January Payment to others, violated Stroudwater's contractual obligations to treat all of its noteholders equally. Kirsch Countercl. ¶¶ 103–07. Although he brings only a breach of contract claim, Mr. Kirsch asserts that this disparate payout of the January Payments also constitutes conversion. Kirsch Countercl. ¶ 105.

Mr. Behn and Ms. Daigle bring four additional counterclaims.[4] Counterclaim Count III ("**Behn/Daigle Count III**") is a breach of contract claim against Stroudwater, alleging that Stroudwater breached Mr. Behn's and Ms. Daigle's

---

[4]     Because, as described below, I ultimately allow Mr. Behn's and Ms. Daigle's requested amendments, for purposes of convenience, I rely on the allegations in their proposed amended counterclaims.

employment agreements by failing to pay all of their compensation and also because of how their notice of termination occurred. Behn PAC ¶¶ 160–63; Daigle PAC ¶¶ 184–87. Counterclaim Count IV is a quantum meruit claim against Stroudwater alleging that Stroudwater failed to pay Mr. Behn and Ms. Daigle for their services. Behn PAC ¶¶ 166–69; Daigle PAC ¶¶ 190–93. Counterclaim Count V is an unjust enrichment claim against Stroudwater alleging that Stroudwater received the benefit of Mr. Behn's and Ms. Daigle's services without paying for their value. Behn PAC ¶¶ 172–74; Daigle PAC ¶¶ 196–98. Counterclaim Count VI is an employment discrimination claim against Stroudwater alleging that Stroudwater mistreated, under-rewarded, and terminated Mr. Behn and Ms. Daigle because of the respective concerns they raised about the pricing tool and, in Ms. Daigle's case, because of her medical condition. Behn PAC ¶¶ 181–82; Daigle PAC ¶¶ 205–07.

## DISCUSSION

### I.    Motion to Amend

#### A.    Procedural History

As a part of their original Counterclaims, which they filed on June 7, 2021, Mr. Behn and Ms. Daigle mentioned that they had filed complaints of discrimination in employment against Stroudwater with the Maine Human Rights Commission ("**MHRC**"), that they would soon be eligible to request "right to sue" letters from the MHRC, and that they intended to request those letters. Behn Countercl. ¶¶ 71–72; Daigle Countercl. ¶¶ 71–72. Each also stated that he/she would "seek to bring [his/her] claims against Stroudwater by adding an additional counterclaim for

discrimination in employment in this action following receipt of a right to sue letter." Behn Countercl. ¶ 73; Daigle Countercl. ¶ 73.

In the interim, each brought a "placeholder" count of sorts. Both Counterclaims contain a "Count VI" described as a claim for "Discrimination in Employment." Behn Countercl., at 51; Daigle Countercl., at 51. But both Counterclaims explicitly acknowledged that Mr. Behn and Ms. Daigle were "not entitled to assert [their] claims" at the time the Counterclaims were filed and declared that they were "notif[ying] the Court and Stroudwater" of their intent to amend their Counterclaims upon the receipt of their right to sue letters. Behn Countercl. ¶ 135; Daigle Countercl. ¶ 134.

On October 12, 2021, Mr. Behn and Ms. Daigle received their right to sue letters from the MHRC. Counter-Claimants' Mot. to Amend 3 (ECF No. 27). And, true to their earlier stated intentions, on October 14, 2021, both Counter-Claimants filed motions to amend "to add claims for employment discrimination." Counter-Claimants' Mot. to Amend 3. The Amended Counterclaims introduce new and specific facts pertaining to Mr. Behn's and Ms. Daigle's allegations of employment discrimination, and they replace the earlier placeholder counts (what used to be labeled "Count VI") with specific allegations of employment discrimination (still labeled "Count VI"). Behn PAC ¶¶ 71–121, 176–85; Daigle PAC ¶¶ 71–145, 200–07.

The Counter-Defendants argue that the motion should be denied on the ground of futility. Opp'n to Counterclaim Pls. John Behn and Laurie Daigle's Mot. to Suppl. or Amend Countercls. ("**Counter-Defs.' Opp'n to Mot. to Amend**") 2–3 (ECF No.

28). The employment discrimination claims are futile, the Counter-Defendants say, because Mr. Behn and Ms. Daigle filed their employment discrimination claims as a part of their original Counterclaims (despite their protestations to the contrary), and they did so without fully exhausting their administrative remedies. Counter-Defs.' Opp'n to Mot. to Amend 3. The Counter-Defendants then argue that Mr. Behn and Ms. Daigle cannot receive the only remedies they are seeking (due to this alleged failure to exhaust), and so the proposed amendments would be futile and should be denied. Counter-Defs.' Opp'n to Mot. to Amend 3–4 & n.2.

## B.    Legal Standard

"The court may permit a party to file a supplemental pleading asserting a counterclaim that matured or was acquired by the party after serving an earlier pleading." Fed. R. Civ. P. 13(e). In addition, Rule 15(a) of the Federal Rules of Civil Procedure allows for amendment to a pleading with leave of court and directs the court to "freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Leave to amend may be denied for a multitude of reasons, including on the ground of futility. *Kader v. Sarepta Therapeutics, Inc.*, 887 F.3d 48, 60 (1st Cir. 2018). An amendment is futile if the amended claim(s) "would fail to state a claim upon which relief could be granted." *Rife v. One W. Bank, F.S.B.*, 873 F.3d 17, 21 (1st Cir. 2017) (quoting *Glassman v. Computervision Corp.*, 90 F.3d 617, 623 (1st Cir. 1996)).

## C.    Analysis

Mr. Behn and Ms. Daigle treat Rule 13(e) and Rule 15(a) as alternative bases for why their proposed amendments should be allowed. Counter-Claimants' Mot. to Amend 5. The Counter-Defendants not only do not dispute that these alternative

14

bases exist, but they ignore the application of Rule 13(e) entirely. Instead, they only argue that leave to amend should be denied on the ground of futility.

I agree with Mr. Behn and Ms. Daigle that Rule 13(e) permits their amendment because, at the time they filed their Counterclaims, they did not have right to sue letters and thus were not permitted to bring their employment discrimination claims. The Counter-Defendants do not offer any argument or authority to support the idea that Rule 13(e) has a futility exception. Having failed to address the Rule 13(e) issue, the Counter-Defendants have waived any objection to it. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990).[5] The Motion to Amend is **GRANTED**.

At oral argument, I noted that the proposed amended counterclaims do not appear to allege that Mr. Behn and Ms. Daigle have filed a claim with the MHRC and received right-to-sue letters. That appears to be a technical requirement required by the Maine Human Rights Act ("**MHRA**"). *See* 5 M.R.S. § 4622(1). As a result, I am extending to Mr. Behn and Ms. Daigle additional leave to amend to correct that omission in their Amended Counterclaims should they choose to do so.

---

[5]     The Counter-Defendants make an identical version of their futility argument in their motion to dismiss as a basis for why they say Count VI should be dismissed from Mr. Behn's and Ms. Daigle's Counterclaims. Mem. of Law in Supp. of Counter-Defs.' Mot. to Dismiss 15–18 (ECF No. 23). While the analysis with respect to both motions is more or less the same, because of the differing standards of review, I address the motion to dismiss argument below. And, for the same reasons why I ultimately find that Count VI should not be dismissed, even if I were to address the Counter-Defendants' futility argument, my analysis would dictate the finding that amendment is not futile and should be permitted.

## II.    Motion to Dismiss

### A.    Legal Standard

When evaluating a motion to dismiss, I take "as true all well-pleaded facts alleged in the complaint and draw all reasonable inferences therefrom in the pleader's favor." *Alston v. Spiegel*, 988 F.3d 564, 571 (1st Cir. 2021) (quoting *Santiago v. Puerto Rico*, 655 F.3d 61, 72 (1st Cir. 2011)). "[A] complaint will survive a motion to dismiss when it alleges 'enough facts to state a claim to relief that is plausible on its face.' " *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is "plausible" if the facts alleged give rise to a reasonable inference of liability. *Id.* "Plausible" means "more than merely possible." *Germanowski v. Harris*, 854 F.3d 68, 71 (1st Cir. 2017) (quoting *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012)). In evaluating the plausibility of a claim, it is helpful to examine the claim against the background of the elements of a prima facie case for liability. *Id.* at 72. But "[i]t is not necessary to plead facts sufficient to establish a prima facie case at the pleading stage." *Id.* (quoting *Rodríguez-Reyes v. Molina-Rodríguez*, 711 F.3d 49, 54 (1st Cir. 2013)).

On a motion to dismiss, courts "usually consider only the complaint, documents attached to it, and documents expressly incorporated into it." *Foley v. Wells Fargo Bank, N.A.*, 772 F.3d 63, 72 (1st Cir. 2014). But in some circumstances, a court may consider additional evidence, including documents where the authenticity is not disputed, "documents central to" the plaintiff's claim, or "documents sufficiently referred to in the complaint." *Id.* at 74 (quoting *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993)). "When the complaint relies upon a document, whose authenticity is not

challenged, such a document 'merges into the pleadings' and the court may properly consider it under a Rule 12(b)(6) motion to dismiss." *Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001) (quoting *Beddall v. State St. Bank & Tr. Co.*, 137 F.3d 12, 17 (1st Cir. 1998)).

### B.   Analysis

#### 1.   Count I – Breach of Contract Due to Refusal to Provide Access to Books and Records

The Counter-Defendants initially moved to dismiss Count I on the ground that the Counter-Claimants are not entitled to the relief sought (specific performance and attorneys' fees). Mem. of Law in Supp. of Counter-Defs.' Mot. to Dismiss ("**Counter-Defs.' Mot. to Dismiss**") 5–7 (ECF No. 23). In addition, in reply, the Counter-Defendants contend that Count I is now moot because they say that they notified the Noteholders the day before filing their reply that they would make the 2019 books and records available to the Noteholders within five business days and that they would make the 2020 records available when completed, by the end of September 2021. Reply in Supp. of Countercl. Defs.' Mot. to Dismiss Countercls. ("**Counter-Defs.' Reply**") 7 (ECF No. 25). At oral argument, counsel for the Counter-Defendants claimed that Stroudwater had now provided the financial records for both 2019 and 2020, but the Counter-Claimants' counsel represented that the Noteholders had only received high-level financial summaries and that they had not been given the "access to all of the Company's books and records" required by the Loan Agreements. Based

on the representations at oral argument, this claim is clearly not moot as the Counter-Defendants contend it is.[6]

The Counter-Defendants also argue that the Noteholders are not entitled to specific performance because they can pursue a claim for monetary damages. But the Counter-Defendants fail to identify a way in which damages could offset the harm of the failure to disclose the company books and records. Other courts to have considered the issue have found specific performance to be appropriate in similar situations. *See, e.g.*, *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 579–80, 585 (6th Cir. 2007) (finding that there existed no "adequate remedy at law to enforce" parties' credit agreement allowing for inspection of financial records); *Microsoft Corp. v. Weidmann Elec. Tech. Inc.*, Case No. 5:15-cv-153, 2016 WL 7165949, at *10 (D. Vt. Dec. 7, 2016) ("[S]pecific performance is available because there is no adequate remedy at law for Weidmann's breach of its verification obligation.").

Finally, the Counter-Defendants' argument that the Noteholders are not entitled to attorneys' fees because there is no statute or written agreement entitling them to fees is undercut by § 5(f) of the Loan Agreements. This section entitles the Noteholders to "Collection Costs," which are defined to include "any and all costs and

---

[6]    Even if Stroudwater had provided full access to its books, a "defendant cannot automatically moot a case simply by ending its unlawful conduct once sued. Otherwise, a defendant could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (citation omitted). As a result, "a defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000)). The Counter-Defendants have failed to meet that burden here.

expenses of enforcing" the Loan Agreements, including "the reasonable fees, expenses and disbursement of [their] legal counsel." Taking all reasonable inferences in the Noteholders' favor, I must construe this to mean that they are entitled to attorneys' fees because they are suing to enforce the Loan Agreements.

The motion to dismiss Count I is **DENIED**.

### 2.    **Count II – Breach of Trust and Fiduciary Duties**

The Counter-Defendants levy three attacks against Count II. They argue that the Subordination Agreements bar Count II, that the Counter-Defendants breached no duties under the Loan Agreements, and that the Individual Counter-Defendants owed no duty to the Noteholders. Counter-Defs.' Mot. to Dismiss 7–11. I address each in turn.

Pursuant to the Subordination Agreements,[7] the Noteholders agreed not to sue Stroudwater "to recover all or any part of the" money owed to them until Stroudwater paid the money it owed to BSB. The Counter-Claimants assert that they are suing

---

[7]      The parties dispute whether I can properly consider the Subordination Agreements at this stage of the litigation. The Counter-Claimants insist that I cannot because they "are not attached to the pleadings or referred to therein." Mem. in Opp'n to Mot. to Dismiss Countercls. 11 n.3 (ECF No. 24). But in addition to documents sufficiently referred to in a complaint, I can also consider documents where authenticity is not disputed. The Counter-Claimants do not challenge the authenticity of the Subordination Agreements. The Loan Agreements and Junior Security Agreements ("**JSAs**")—all of which were attached to the Counterclaims—mention the subordination of the Noteholders' interests. And the JSAs specifically obligate the Noteholders to confirm this subordination in writing. This appears to be a specific reference to the Subordination Agreements.

At oral argument, counsel for the Counter-Claimants asserted that based on the limited financial information that he has received from Stroudwater, it appears that the Bangor Savings Bank ("**BSB**") loan has been paid off. If that were the case, then the Subordination Agreements should no longer be in effect. But at the motion to dismiss stage, I am limited to what is contained in the pleadings, documents that are sufficiently referred to in the pleadings, and documents where authenticity is not disputed. The Counter-Claimants themselves assert that Stroudwater still owes BSB over $2,000,000. Countercls. ¶ 49 (ECF Nos. 12, 13, 14, 15, 16). Indeed, the allegation that Stroudwater owes this money to BSB is part of the basis for the Counter-Claimants' allegation that Stroudwater is insolvent. Accordingly, I consider the Subordination Agreements in my analysis.

for damages caused by the Counter-Defendants' alleged breaches of fiduciary duties owed to Stroudwater's creditors; they are not suing to recover the money owed to them. Mem. in Opp'n to Mot. to Dismiss Countercls. ("**Counter-Claimants' Opp'n**") 13 (ECF No. 24). The Counter-Defendants dispute this by tallying up the number of times Count II uses the term "interest payments," and they say that if the Counter-Claimants are not suing to recover the money owed to them through Count II, then "it is unclear" what they are seeking. Counter-Defs.' Reply 4.

The Counter-Defendants misunderstand the purpose of Count II. Count II does not allege that the Counter-Defendants are obligated to pay any of the money owed to the Noteholders under the Loan Agreements. Rather, it alleges that the Counter-Defendants have breached their fiduciary duties to the Noteholders. What the Counter-Defendants are seeking in terms of a remedy is damages for these alleged breaches, not repayment of their loans. Johnson Countercl. ¶ 101 ("Sommer, Shell, and Greenway are liable for their multiple breaches of fiduciary duties and other duties owed . . . ."); Kirsch Countercl. ¶ 101 (same); Sprinkle Countercl. ¶ 101 (same); Behn PAC ¶ 159 (same); Daigle PAC ¶ 183 (same).

The Counter-Defendants next contend that they breached no duties under the Loan Agreements, arguing that Stroudwater was entitled under the Loan Agreements to defer interest payments. Counter-Defs.' Mot. to Dismiss 8–9. Even if I assume that this assertion is true, this argument still fails due to the depth of Count II. Count II alleges multiple breaches of fiduciary duties beyond the alleged failure to pay interest payments, including that Mr. Sommer and Mr. Shell overstated and

misrepresented the financial position and value of Stroudwater and that the Individual Counter-Defendants forced out some Stroudwater employees (and favored others) in order to elevate their own standing at the expense of the ESOP participants and Stroudwater's creditors.

Finally, the Individual Counter-Defendants argue that they owed no duty to the Noteholders because, under Maine law, corporate directors only owe a duty to the corporation (i.e., the shareholders), not to creditors. Counter-Defs.' Mot. to Dismiss 9–11. But in support of this assertion the Counter-Defendants cite to cases that do not involve creditors, cases involving solvent corporations,[8] and cases involving Delaware law. Counter-Defs.' Mot. to Dismiss 9–10 (citing various cases). These cases do not offer answers to the relevant question of whether the directors of an insolvent corporation (such as Stroudwater, according to the Counter-Claimants' allegations) owe a duty to the corporation's creditors under Maine law. The Counter-Defendants also point to the Maine Business Corporation Act, which they say does not provide a cause of action for creditors against directors. Counter-Defs.' Reply 2 (citing 13-C M.R.S. § 832). But that statute is not helpful to this inquiry, because it does not lay out when a corporate director *is* liable, but only when a corporate director is *not. See* 13-C M.R.S. § 832(1).

---

[8]      The Counter-Defendants lean heavily on *Tiernan v. Barresi*, which held that "under Maine law . . . a party who is not a shareholder has no standing to litigate a breach of fiduciary duty claim against corporate directors," including creditors. 944 F. Supp. 35, 37 (D. Me. 1996). But it does not appear that *Tiernan* involved an insolvent corporation, and, in evaluating corporate duties under Maine law, the court analyzed a now-repealed statute, which "expressly create[d] a duty on the part of the directors and officers of a corporation to act in good faith toward the corporation and the shareholders" whereas no such statute created a duty vis-à-vis creditors. *See id.*

I agree that "[a]t least while a corporation remains solvent, Maine law has not recognized any directors' duty to creditors." *Dev. Specialists, Inc. v. Kaplan*, 574 B.R. 1, 13 (D. Me.), *aff'd sub nom. Irving Tanning Co. v. Kaplan*, 876 F.3d 384 (1st Cir. 2017). But "[a]s a matter of common law . . . when a corporation becomes insolvent . . . the corporate directors and officers are viewed as trustees of the corporate assets, and they then become engaged in a fiduciary relationship with the corporation's creditors." *Paper, Allied-Indus., Chem. & Energy Workers Int'l Union v. Sherman Lumber Co.*, No. CV-00-41, 2001 WL 1719233, at *6 (Me. Super. Ct. June 28, 2001) (citing *Mitsubishi Caterpillar Forklift Am., Inc. v. Superior Serv. Assocs., Inc.*, 81 F. Supp. 2d 101, 115–16 (D. Me. 1999) and *Symonds v. Lewis*, 48 A. 121, 123 (Me. 1901)); *see* Fletcher Cyclopedia of the Law of Corporations § 1035.60 (2021) ("In most jurisdictions, when a corporation becomes insolvent, officers and directors of a corporation owe a fiduciary duty to the corporation's creditors.").

This does not necessarily settle the issue. The Counter-Defendants put forward legitimate arguments as to why I should not follow *Mitsubishi* or *Symonds*. But at the end of the day, neither the Individual Counter-Defendants nor the Counter-Claimants has identified a case arising under Maine law that fully analyzes this fiduciary duty issue in the context of a creditor suing a director of an insolvent corporation. It is the Counter-Defendants' burden to establish that the Counter-Claimants have no plausible claim for a breach of fiduciary duty, and they have not met this burden. The motion to dismiss Count II is **DENIED**.

### 3. Kirsch Count III – Breach of Contract Due to Failure to Make January Payment to Kirsch

Mr. Kirsch alleges in Kirsch Count III that the Counter-Defendants' failure to make Mr. Kirsch's January Payment breached the Loan Agreements' requirement that interest payments must be made biannually (§ 2(f)) and breached the JSAs' and Intercreditor Agreements' requirements "to treat all noteholders with equal priority" (§ 1 and § 3(a), respectively). Counter-Claimants' Opp'n 2, 15–17. At oral argument, counsel for the Counter-Claimants clarified that it considers payments of interest to some Noteholders but not to Mr. Kirsch to be a violation of the Intercreditor Agreements' provision on the use of collateral. *See* Intercreditor Agreements § 3(a). According to Counter-Claimant Kirsch, because Stroudwater's cash is an asset that should be considered collateral, Stroudwater was required to make the interest payments "in proportion to amounts owing to the [Noteholders] on account of their outstanding Loans." Intercreditor Agreements § 3(a) (emphasis deleted). This issue may ultimately depend on whether the Subordination Agreement is in effect. *See supra* note 7. While it is not clear to me that there is any duty under the Agreements to pay interest, it is plausible that any interest payments that are made must be made to each of the Noteholders. At this stage of the proceedings, I credit Counter-Claimant Kirsch's theory, and I **DENY** the Motion to Dismiss Count III.

### 4. Behn/Daigle Counts III (Breach of Contract Due to Breach of Behn and Daigle Employment Agreements) and IV (Quantum Meruit)

Proving a breach of contract claim requires proof of a breach of a material contract term, causation, and damages. *Me. Energy Recovery Co. v. United Steel*

*Structures, Inc.*, 1999 ME 31, ¶ 7, 724 A.2d 1248, 1250. The Counter-Defendants argue that Behn/Daigle Count III fails to establish any of those elements because Mr. Behn's and Ms. Daigle's allegations of a breach of their employment agreements is too nonspecific. Counter-Defs.' Mot. to Dismiss 12–14. In particular, the Counter-Defendants complain that Mr. Behn and Ms. Daigle never identify which provision(s) of their employment agreements was/were breached. Counter-Defs.' Mot. to Dismiss 12–13.

Mr. Behn and Ms. Daigle have both alleged that they had employment agreements with Stroudwater and that Stroudwater breached material terms of these contracts by failing to pay them all of the compensation that they are due. Behn PAC ¶¶ 122–28, 161–62; Daigle PAC ¶¶ 146–52, 185–87. This is sufficient to support their claims. Contrary to the Counter-Defendants' assertion, Mr. Behn and Ms. Daigle allege that their employment agreements required compensation for 2019 and 2020 that they were not paid. And the Counter-Defendants identify no authority for the idea that Mr. Behn and Ms. Daigle must identify anything more specific in their pleadings, such as the specific provisions of their employment agreements at issue.

Similarly, the Counter-Defendants' assertions that Mr. Behn and Ms. Daigle have insufficiently alleged damages is contradicted by the Amended Counterclaims (and, for that matter, the Counterclaims). Both Mr. Behn and Ms. Daigle allege that the Counter-Defendants failed to pay them particular forms of compensation that they were due, such as their base salaries for June 30, 2020; their 401(k) employer

contribution; and unpaid incentive bonuses and commissions for revenue generated in 2019 and 2020.

For the same reason, in the context of the quantum meruit claim (Count IV), although the Counter-Defendants contend that Mr. Behn and Ms. Daigle have not specified which services were rendered and why they were entitled to payment, the Amended Counterclaims belie this claim. Behn PAC ¶¶ 122–28; Daigle PAC ¶¶ 146–52. The motions to dismiss Behn/Daigle Counts III and IV are **DENIED**.

### 5.    Count V – Unjust Enrichment

The Counter-Defendants move to dismiss Mr. Behn and Ms. Daigle's unjust enrichment claim on the ground that the existence of their employment agreements (which the Counter-Defendants acknowledge) precludes such a claim. Counter-Defs.' Mot. to Dismiss 15. Nevertheless, the Federal Rules of Civil Procedure specifically allow a party to plead alternative, and even inconsistent, claims for liability. Fed. R. Civ. P. 8(d)(2) ("A party may set out 2 or more statements of a claim or defense alternatively . . . ."), (d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency."); *cf. GMAC Com. Mortg. Corp. v. Gleichman*, 84 F. Supp. 2d 127, 136–37 (D. Me. 1999) ("While the Maine Law Court has recognized 'that the existence of a contract precludes recovery on a theory of unjust enrichment' . . . a party, nonetheless, is not precluded from pleading both theories because a factfinder may find that no contract exists and may still award damages on a theory of unjust enrichment.' " (quoting *June Roberts Agency, Inc. v. Venture Props., Inc.*, 676 A.2d 46, 49 n.1 (Me. 1996)). The motion to dismiss Count VI is **DENIED**.

### 6. Count VI – Employment Discrimination[9]

The MHRA limits a plaintiff's remedies if, "prior to the filing of the civil action,"
the plaintiff fails to file a complaint with the MHRC and the MHRC fails to act in a
particular manner, such as by issuing a right-to-sue letter. 5 M.R.S. § 4622(1). The
Counter-Defendants allege that Mr. Behn's and Ms. Daigle's remedies are so limited
because when they filed their Counterclaims (which was before they received their
right-to-sue letters), they "fil[ed]" their "civil action." The Counter-Defendants put
forth this argument despite Mr. Behn's and Ms. Daigle's explicit statements in their
Counterclaims that they were not yet bringing their employment discrimination
claims. Behn Countercls. ¶ 72 (noting future "eligib[ility] to request a 'right to sue'
letter"); ¶ 73 ("Behn will seek to bring his claims . . . following receipt of a right to sue
letter."); ¶ 135 ("Because Behn is not entitled to assert his claims currently pending
before the [MHRC] until his receipt of a right to sue letter, Behn hereby notifies the
Court and Stroudwater that he intends to amend these Counterclaims upon his
receipt of the right to sue letter from the [MHRC]."); Daigle Countercls. ¶¶ 72–73,
134.

---

[9]    I recognize that the Counter-Defendants' motion to dismiss pertained to Mr. Behn's and Ms.
Daigle's original Count VI and that that count will now be supplanted by the amended versions of
Count VI. I also recognize that the Amended Counterclaims have not yet been filed. For the sake of
efficiency, I treat the Counter-Defendants' motion to dismiss, in combination with their opposition to
the motion to amend, as a motion to dismiss the new versions of Count VI for the same reasons as in
that motion and that opposition. However, now that I have allowed the requested amendments, once
the Amended Counterclaims are filed, the Counter-Defendants may still file a motion as to the merits
of the new versions of Count VI (should they wish to do so) to the extent permitted by the Federal
Rules of Civil Procedure.

The Counter-Defendants offer no authority to support their formalistic contention that the filing of "placeholder counts" is sufficient to trigger the bar on the particular remedies outlined in § 4622. I credit Mr. Behn and Ms. Daigle's assertions that they were not yet bringing their employment discrimination claims but were merely putting Stroudwater and the Court on notice that those claims were coming down the pike. I thus conclude that Mr. Behn and Ms. Daigle did not "rush[ ] to assert Count VI before complying with the provisions of § 4622," Counter-Defs.' Mot. to Dismiss 18, as the Counter-Defendants contend. The Counter-Defendants' contention is particularly ironic since Mr. Behn and Ms. Daigle were first hauled into Court by Stroudwater; they did not race to assert their claims without regard to the MHRA. The motion to dismiss Count VI is **DENIED**.

## CONCLUSION

For the reasons stated above, the Court **GRANTS** the motion to amend (ECF No. 27) and *sua sponte* **GRANTS** the Counter-Claimants further leave to amend their Amended Counterclaims as stated above, within seven days. The Court **DENIES** the motion to dismiss (ECF No. 22).

SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 7th day of December, 2021.

27